UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SANDEE K.,[1]

                                    Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                                    Defendant.

_____

DECISION and
ORDER

1:21-CV-6116 CJS

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or

"Defendant") which denied the application of Plaintiff for Social Security Disability

Insurance benefits.   Now before the Court is Plaintiff's motion (ECF No. 18) for

judgment on the pleadings and Defendant's cross-motion (ECF No. 21) for the

same relief.   For the reasons discussed below, Plaintiff's application is denied,

and Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-

step sequential evaluation process:

A five-step sequential analysis is used to evaluate disability claims.
*See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that,
"[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42
U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-
government party will be identified and referenced solely by first name and last initial."

considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[3]

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[3] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.  In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).  Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the

correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.   The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original, citations and internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review

prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff claims to be disabled due to a combination of impairments including anxiety, migraine headaches, a history of attention deficit disorder ("ADD") and borderline personality disorder.   The Court will briefly summarize the medical evidence in the administrative record.

Plaintiff was born in 1982 and was 37 years of age as of the date of the administrative hearing. (Tr. 68).   Plaintiff obtained a high school GED diploma and while in school was classified as "other health impaired" due to attention deficit disorder ("ADD"), for which she was permitted to have testing modifications. (Tr. 256).   Plaintiff's Section 504 Accommodation Plan reported that, "Sandee may

shut down academically.   She is unwilling to take risks.   Sandee is very bright but has difficulty accepting the responsibilities of traditional school." (Tr. 256).   Plaintiff attended some college classes but eventually stopped attending, purportedly due to "anxiety and focus problems." (Tr. 71).

Plaintiff does not have a driver's license, and she has offered differing reasons for that, including that driving makes her too anxious, that migraine headaches impair her vision, and that she lacks depth perception. (Tr. 70, 434) (Can't drive due to anxiety); *see also*, Tr. 521 (Coffey: "Panic while driving – visual distortions prevent her from driving"); Tr. 559 ("Also is unable to drive, which she relates to her migraine auras, tells me that she is unable to perceive depth, and struggles with driving.").   Consequently, Plaintiff gets around by bicycle, public transportation, and transportation provided to her by various agencies based on her alleged disabilities.

Plaintiff is divorced and has two teenage sons, both of whom are diagnosed with autism.   She has custody of her sons every other weekend, and at other times for longer periods. (Tr. 68, 69).   Plaintiff acknowledges that the New York State Courts do not accept her claim of disability, and have ordered her to pay child support to her ex-husband.[4]

---

[4] At one point in the record, Plaintiff indicates that the judge who imposed the child support obligation, and who had her jailed for non-payment of same, did not believe her claim of disability.

The record indicates that, apart from going to medical appointments, Plaintiff typically spends her days caring for her pet cats, having her teenage sons visit, going to the library and engaging in conversations,[5] drawing pictures, attending social events at her apartment building, and spending time online with social media and gaming.[6] (Tr. 282, 372–373).

Treatment notes from Plaintiff's primary care providers, Azfar Ahmed, MD ("Ahmed") and Jennifer Coleman, PA ("Coleman"), typically report normal mental/psychiatric findings. *See, e.g.*, Tr. 536–538.

Between June 2016 and November 2017, Plaintiff received treatment at Clifton Springs Behavioral Health, primarily for depression. (Tr. 644).   Plaintiff received bi-weekly mental health treatment sessions at Clifton Springs Behavior Health from therapist Christa Coffey, MHC, working with psychiatrist Dr. Rohit Madan. (Tr. 542, 544).   On January 25, 2017, Coffey completed a treatment report for NYS Office of Adult Career and Continuing Education Services ("ACCES-VR"),

---

[5] Plaintiff indicates that she enjoys going to a public library and seeking out conversations with strangers, which is inconsistent with her claims elsewhere in the record that she prefers to "isolate" herself and finds it "always hard to be around people." (Tr. 290), (Tr. 73) ("Going out in public is difficult.   Being around people is, is very difficult.").

[6] While it does not appear to have been a factor in the ALJ's decision, the record raises a question about the amount of time that Plaintiff may spend gaming each day and how it affects her work history.   Plaintiff's live-in boyfriend of eight years, with whom she has a purportedly on-and-off again, volatile, and verbally abusive relationship, submitted an affidavit noting in pertinent part that, Plaintiff "can remember things about money, work, and cleaning but she has to socialize and spend time on Facebook before [these] things [are done]," and that, "she will miss times and dates if she is gaming and then blame it on other people." (Tr. 372–373).  Also, a mental health treatment provider stated that, "Client reports having an addictive personality, and that anything she does she goes to the max.   She reports this is especially true with gaming." (Tr. 706) (emphasis added).   In 2017, a mental health therapist (Coffey) also seems to have indicated that Plaintiff had "recent financial problems" from "gambling, unemployment," presumably referring to online gambling. (Tr. 580).

indicating that despite Plaintiff's diagnoses of generalized anxiety disorder and borderline personality disorder, she had a "good" ability to work. (Tr. 520–521).   In that regard, when asked to state Plaintiff's "functional limitations," Coffey indicated that Plaintiff just needed to avoid "loud, chaotic environments," but that Plaintiff worked well independently. (Tr. 521) ("Struggles with loud, chaotic environments. Works well independently – no need for immediate constant supervision."); *see also, id*. ("Anxiety increases in fast paced, chaotic, loud environments.").   Indeed, Coffey challenged Plaintiff's suggestion that she was "unemployable" and encouraged Plaintiff to pursue employment opportunities on her own, and not simply wait for assistance from ACCESS-VR, an agency providing assistance to persons with disabilities. (Tr. 544).

More generally, during Coffey's year of treating Plaintiff, she reported that Plaintiff had normal mental status examinations at their sessions, with euthymic mood (*See*, e.g., Tr. 574–575), but that Plaintiff discussed having anxiety in response to various stressors, such as owing child support.   Coffey advised Plaintiff to utilize "coping skills and relaxation techniques" which were "effective" for Plaintiff, but which Plaintiff was not utilizing. (Tr. 545, 548).

On March 13, 2017, while still in treatment with Madan and Coffey, Plaintiff went to Clifton Springs Hospital claiming to be depressed and possibly suicidal due to a series of recent events in her life.   An intake evaluator wrote:

> The patient is a 35 year old woman with a history of depression that is both chronic and recurrent.   The patient's depression at this point is at least in part driven by progressive psychosocial difficulties

> including an untenable situation with her boyfriend, legal problems, financial problems, and the inability to see her children[,] who reside with her ex-husband[,due to non-payment of child support.   As a result, the patient has been thing about suicide.

(Tr. 453).   Actually, though, Plaintiff attributed her emotional upheaval at that moment to two more specific events: First, she believed that she had not received a job offer that she was expecting; and, second, she had learned that there was a warrant issued for her arrest due to non-payment of child support. (Tr. 448). Plaintiff further indicated that she had not been taking her medications, because she had lost her health insurance. (Tr. 448).   According to the evaluator, Plaintiff "reports instead of trying to improve any of these situations she spends her time on the couch unmotivated to do anything." (Tr. 448).   Plaintiff was admitted to the hospital for stabilization, and quickly improved, and was discharged after being given medications including venlafaxine (Effexor). (Tr. 466) ("[P]atient's suicidality tapered and disappeared fairly quickly for which reason she was discharged on March 16, 2017.").

On March 16, 2017, Coffey reported that Plaintiff had just been released from the hospital, where she had gone because she became stressed and upset after finding out that she was not offered a job which she had been hoping would be offered to her. (Tr. 548).   Coffey noted, however, that Plaintiff had been mistaken, and that the job actually had been offered to her after all. (Tr. 548) ("She reports that there was a mis-communication and she actually did get the job.   She presented upbeat and in what she described as a 'good mood.'").

On May 2, 2017, however, Dr. Madan noted that Plaintiff reported "ongoing stress due to being unable to find a job." (Tr. 559).   Madan further reported, though, that Plaintiff admitted she was not really pursuing employment, since she hoped to be moving away from her boyfriend. (Tr. 559) ("She does admit that she has not been trying actively [to find a job] as she should, because she does not like the place where she currently lives. ... Currently lives with boyfriend, Dan, but reports that he is verbally and emotionally abusive. ...   [W]ants to move out.").

Overall, the notes by Madan and Coffey predominantly refer to Plaintiff's emotional lability due to external stressors such as her living arrangement, lack of employment, and disputes with her ex-husband. *See, e.g.*, (Tr. 559) ("Ongoing stressors due to being uncomfortable in the living arrangement she is in, and lack of employment."); (Tr. 566) ("Sandee continues to report mood lability which currently appears to be tied to life stressors such as engagement with family members whom she identifies as triggers for her symptoms."); (Tr. 587) ("Writer and Sandee review that most of her triggers have been situational stressors and with resolution of those she has experienced decease in symptoms.").

In September 2017, Plaintiff left her boyfriend, moved to Geneva, New York, where she obtained supported housing through Ontario County, and began seeking mental health treatment through Ontario County Mental Health. (Tr. 647).[7]

---

[7] Ontario County treatment records show an admission date of November 8, 2017, but Plaintiff indicated that she began treatment there in or about October 2017 (Tr. 531), and the earliest note from Ontario County appears to be on September 26, 2017. (Tr. 609) (initial consult with FNP Bailey).

Plaintiff's subsequent treatment with Ontario County Mental Health consisted of talk therapy with Kaitlyn Berube, LCSW ("Berube") and medication management by nurse practitioner Veronica Bailey, FNP ("Bailey") and psychiatrist Jessica Norton, M.D. ("Norton") (Tr. 652, 614).

On November 7, 2017, psychologist Christine Ransom, Ph.D. ("Ransom") performed a consultative psychiatric examination of Plaintiff at the Commissioner's request. (Tr. 531–534).   Plaintiff reportedly told Ransom that she had stopped working in 2016 due to migraine headaches. (Tr. 531).   Plaintiff reported having no hospitalizations. (Tr. 531).   Plaintiff reported having anxiety that was typically "mild and at a low level which does not interfere with her functioning." (Tr. 531–532).   Plaintiff denied having any "clinical level depression, panic attacks, manic symptomatology, thought disorder, cognitive symptoms and deficits, suicidal and homicidal ideation, phobic and trauma responses." (Tr. 532).   Plaintiff, who was then age 35, reported having recently stopped using marijuana "episodically." (Tr. 532).   Plaintiff reported that she took care of her own cooking, cleaning, and personal care, and that she was working on budgeting, to which Ransom observed that Plaintiff was "probably ready to be her own payee." (Tr. 533).

The results of Ransom's examination were essentially normal, with full affect, neutral mood, intact attention, concentration, and memory, average cognitive functioning, and adequate insight and judgment. (Tr. 532-533).

Ransom's "medical source statement" opinion indicated that Plaintiff was generally able to work, with some limitations related to anxiety:

> This individual will have mild episodic difficulty understanding, remembering and applying complex directions and instructions, regulating emotions, controlling behavior and maintaining wellbeing. She will show no evidence of limitations understanding, remembering and applying simple directions and instructions, using reasoning and judgment to make work-related decisions, interact adequately with supervisors, coworkers and the public, sustain concentration to perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work, maintain personal hygiene and appropriate attire and be aware of normal hazards and take precautions.  Areas of difficulty are secondary to generalized anxiety disorder, currently mild with occasional more intense anxiety. The results of the evaluation are consistent with a psychiatric condition of a mild nature that will not significantly interfere with the claimant's ability to function on a daily basis.

(Tr. 534).

On November 8, 2017, Plaintiff reportedly told staff at Ontario County Mental Health that the reason she was switching to treatment with Ontario County was because she had moved her residence, and because her providers in Clifton Springs had been "too busy" (Tr. 647) or had provided her with "inconsistent care" due to turnover of staff. (Tr. 613).   Plaintiff reported having "difficulty in relationships," as well as "extreme anxiety forever." (Tr. 647).   Plaintiff indicated that she had prior diagnoses of anxiety, depression, and borderline personality disorder, as well as "a strong history of autism spectrum disorder on both sides of [her] family." (Tr. 647).   Plaintiff also reported having attempted suicide a year earlier by taking pills at her home, but she stated that she no longer felt suicidal after cutting ties with her father and moving to a new apartment. (Tr. 650).   Plaintiff also reported that she had "checked herself" into the hospital in March 2017 and

spent a "few days" there. (Tr. 608).

On November 29, 2017, Madan and Coffey formally discharged Plaintiff from treatment at Clifton Springs because she had moved her residence to Geneva and began receiving treatment through Ontario County.   The discharge note indicated that Plaintiff's treatment at Clifton Springs had primarily focused on "relationship issues" and "maintaining healthy boundaries." (Tr. 644).

Unlike the admission notes by Ontario County Mental Health, neither the treatment notes or the discharge note by Madan and Coffey mention a suicide attempt during the eighteen-month period that Plaintiff was treating at Clifton Springs. (Tr. 644).   Nor does Ransom's consultative report mention such an attempt, though it does report that Plaintiff was hospitalized in in March 2017 due to anxiety. (Tr. 531–534).   Moreover, treatment notes from Plaintiff's March 2017 hospitalization report that Plaintiff claimed to have made suicide attempts "when she was younger," but that there was "no documented history of suicide attempts." Tr. 450).

On February 17, 2018, Ontario County supported housing counselor Brian Lyon, QMHS ("Lyon"), performed a functional assessment relating to Plaintiff's request for supportive housing through Lakeview Health Services. (Tr. 598–606). Lyon was asked to rate Plaintiff's self-sufficiency in the areas of healthcare management, mental health symptoms management, activities of daily living skills, personal safety management, social/leisure/vocational management, and chemical dependency management, and in numerous sub-categories thereunder.

13

(Tr. 598–599).   Lyon reported that Plaintiff was "completely self-sufficient" in almost every one of the forty-six subcategories. (Tr. 598–599).   The only exceptions thereto were that Lyon opined Plaintiff would need "minimal/monthly" monitoring concerning "following physicians' orders," "utilizing coping and management strategies," "expresses needs and wants appropriately," "utilizes community supports," "resolves interpersonal conflicts," and "utilizing interpersonal skills." (Tr. 598–599).[8]

On February 26, 2018, Bailey performed an assessment, and Plaintiff indicated that Effexor was "managing" her depression symptoms and that she was not taking medication for anxiety, and felt that talk therapy, not medication, was needed for her anxiety. (Tr. 610–611). Plaintiff indicated that her most recent employment had ended after two weeks due to migraine headaches. (Tr. 611). Bailey noted that Plaintiff's "symptoms" seemed "well managed" by Effexor. (Tr. 613).

Plaintiff eventually had ten talk-therapy sessions with Berube before again switching treatment providers. (Tr. 648).   Plaintiff missed various appointments with Berube, purportedly due to a lack of transportation, and was inconsistent at times in taking her medications. (Tr. 650). Treatment notes at Ontario County

---

[8] The record arguably indicates that Plaintiff originally moved to supported housing primarily not because she needed the "supportive" aspect of such housing, but because she wanted to move away from her boyfriend, whom she maintained was verbally abusive, and because she could qualify for such subsidized housing due to her mental health history. (Tr. 559) ("She does not like the place where she currently lives. . . . Currently lives with boyfriend, Dan, but reports that he is verbally and emotionally abusive.   Does convey that she has been working with Lakeview to get housing, but is on the waiting list.").

generally show normal mental status exams. (Tr. 608–609).   On July 17, 2018, Plaintiff was discharged by Ontario County after she moved to Livingston County. (Tr. 647).

In or about July 2018, Plaintiff sought treatment from Livingston County Mental Health after moving from Geneva to Geneseo. (Tr. 618).   Plaintiff subsequently met with mental health therapist Rachel Peraino, LMHC ("Peraino") on three occasions for assessment prior to treatment.   During one of those sessions, on August 13, 2018, Plaintiff "present[ed] with pressured speech, and pushed for [Peraino] to complete her work assessment [for Livingston County]," but Peraino indicated that her assessment was not completed. (Tr. 715).   Notably, Plaintiff told Peraino, that, regarding her ability to work, she was "somewhere in between 'disabled' and 'looking for work.'" (Tr. 707).   Plaintiff reported having a long history of mental health problems dating back to childhood, including two suicide attempts, the first as a teenager, and the second after she lost custody of her children.

On September 26, 2018, Peraino completed an employment assessment. (Tr. 696–697).   Peraino indicated that Plaintiff's diagnoses were generalized anxiety disorder and major depressive disorder, both with a fair-to-good prognosis, and borderline personality disorder with a fair prognosis. (Tr. 696).   Regarding Plaintiff's functional limitations, Peraino stated that Plaintiff would be moderately impaired in understanding and remembering instructions, interacting appropriately with others, and managing her mental health, and moderately-to-very impaired in

15

functioning in the workplace at a consistent pace. (Tr. 697).

On October 29, 2018, Peraino completed a mental health function report at the request of Plaintiff's disability attorney. (Tr. 616–620).   The report generally indicated that according to Plaintiff's self-reports, Plaintiff would have limitations in various functions that would preclude her from full-time work. In that regard, Peraino noted that she had only known Plaintiff since July 2018. (Tr. 619).   When asked to specify the signs and symptoms supporting her opinion, Peraino indicated fatigue, confusion, difficulty concentrating, short term memory problem, headaches, emotional lability and anxiety. (Tr. 618).   Peraino opined that Plaintiff would miss about three days of work per month, and that Plaintiff "could not be successful working more than 2 days/week to start, possibly with shorter shifts." (Tr. 619).

On November 14, 2018, Mary Beth Peterson, NP ("Peterson") performed a psychiatric assessment for Livingston County Mental Health. (Tr. 750-752). Peterson reported that Plaintiff claimed to feel constantly anxious, frustrated, and afraid, and as if she did not have control of her emotions. (Tr. 750). Plaintiff also claimed to have daily panic attacks. (Tr. 750).   Plaintiff told Peterson that she had been hospitalized at Clifton Springs "multiple times" for severe anxiety, though the record does not support that claim. (Tr. 751).   Plaintiff asserted that she had not worked in two years due to severe anxiety and panic attacks, without mentioning migraine headaches as a factor. (Tr. 751). Peterson reported that Plaintiff's mental status exam was normal, except that Plaintiff became so anxious she developed

hives and appeared to be unable to speak for a time.[9] (Tr. 751).   It is unclear whether Plaintiff was taking any of her medications on that occasion, as Plaintiff reportedly told Peterson that she had not seen a medical provider for her mental health symptoms for two years. (Tr. 751).   In any event, Peterson increased Plaintiff's dosage of Effexor and also prescribed a medication for anxiety. (Tr. 752).

On April 11, 2019, Peraino completed a "Medical Examination for Employability" form for Livingston County DSS, indicating in pertinent part that Plaintiff was capable of part-time employment in a "guided work program." (Tr. 776–777).

On June 12, 2019, Peraino reported that Plaintiff had quit her job due to unspecified "on-the-job stressors," but that she was looking forward to moving into a new apartment. (Tr. 837).

On June 27, 2019, Peraino completed another employability assessment, indicating in pertinent part that Plaintiff was moderately limited in understanding and remembering instructions, interacting appropriately with others, and managing her mental health symptoms, and that she was very limited in maintaining attention and concentration. (Tr. 832–833).   Peraino wrote that Plaintiff "gets very overwhelmed with even [a] very limited work schedule." (Tr. 833).

On July 8, 2019, Peraino reported that Plaintiff was planning to return to work one day per-week, working with a job coach through Livingston County ARC. (Tr. 841).   Plaintiff stated that her two teenage sons, both of whom are autistic,

---

[9] This odd incident is unexplained and entirely inconsistent with the rest of the record.

had just stayed with her for a week, which had been "nice but exhausting." (Tr. 841).

On August 14, 2019, Peraino reported that even though Plaintiff was working very little she claimed that she was extremely fatigued and wanted to sleep all the time, but that she did not feel depressed:

> Sandee presents today, stating that she feels 'either exhausted or too busy,' which is making it difficult to find balance.   She reports that although she is trying to find new jobs for more income, she is happy that she has been able to keep her current per diem job in the meantime.   She is worried about the exhaustion, because she has not been able to identify a trigger to wanting to sleep all the time, reporting that she does not feel depressed[.]

(Tr. 848).   Plaintiff also stated, however, that she wanted to get involved with yoga. (Tr. 848).

On August 26, 2019, Plaintiff told Peraino that she had just had one of her autistic sons visit her for a week, which had been "great." (Tr. 852).   Indeed, Plaintiff brought her son to the appointment with Peraino and attended to his many needs throughout the session. (Tr. 852).    At the same time, Plaintiff fretted "about the limited amount of hours she [was] getting at work." (Tr. 852).   Plaintiff also reported that she was functioning well socially and getting together with a group of friends to pay games once per month. (Tr. 852).

On October 16, 2019, Peraino completed another functional assessment for Plaintiff's attorney which, similar to the report completed on October 29, 2018, generally indicated that according to Plaintiff's self reports, Plaintiff would have

limitations in various functions that would preclude her from full-time work. (Tr. 892–897).   When asked to state any signs or symptoms that Plaintiff displayed, Peraino listed fatigue, confusion, difficulty concentrating, short term memory problems, emotional lability, headaches and anxiety. (Tr. 895).   Peraino asserted that her opinions were consistent with her clinical findings, Plaintiff's complaints, and medical reports from other providers. (Tr. 896).   Peraino opined that Plaintiff would have good days and bad days; that she would miss about four days of work per month; and that she needed a day off between every shift of work. (Tr. 895-896).

The same day Peraino completed this report, October 16, 2019, she had an office visit with Plaintiff, and her notes from that visit essentially indicate that she understood her assessment of Plaintiff's work abilities should essentially reflect Plaintiff's subjective assessment of her own abilities.   In that regard, Peraino wrote:

> Completed work assessment together that was requested by lawyer, using PCT [("person-centered therapy")] to discuss with client her perceptions of what did and did not work with most recent work situation.   Encouraged client to reflect and provide honest answers to questions.

(Tr. 901).[10]   In any event, Peraino further reported that Plaintiff

---

[10]  Peraino relied on Plaintiff's self-reporting in this manner even though, as her notes reflect, she knew that Plaintiff was desperate to receive disability benefits so that she could pay off her child support obligation and avoid returning to jail for non-payment of such obligation. (Tr. 905).   Nor does Peraino seem to have questioned in any way how Plaintiff's self-reported severe symptoms were consistent with her admitted ability to provide full-time care for her two autistic teenage sons for intervals of a week at a time. (Tr. 841); *see also*, (Tr. 773) ("Sandee presents today in a pleasant and cheerful mood, reporting that she had a great Christmas and New Year with her sons."); (Tr.

> continues to engage in her social game groups, finding it helpful to her MH [(mental health)].   She reports that she has not been accepting shifts at work over the past couple of months, due to feeling exhausted and overwhelmed.

(Tr. 901).

On November 13, 2019, Plaintiff told Peraino that she hoped she would get approved for disability benefits so that she could "pay off her back child support." (Tr. 905).   Peraino reported that she and Plaintiff discussed Plaintiff's "upcoming disability hearing" and "potential backup plans for paying child support if she does not get approved for disability." (Tr. 905).   Plaintiff reportedly told Peraino that her continued "fatigue/exhaustion and headaches" were preventing her from taking care of her responsibilities, and that she had quit her part-time job through ARC, "due to not being able to manage symptoms/stressors." (Tr. 905).

That same day, November 13, 20919, Nurse Practitioner Peterson, at Livingston County Mental Health, reported that Plaintiff was complaining of depression, as well as "daily headaches, low energy, no motivation, [and] high anxiety daily," but that "labs" had been performed, and "[n]o reason ha[d] been found for her low energy level." (Tr. 907).   Peterson further noted that, "The client stated she is no longer working as it made her too tired." (Tr. 907).

---

841) ("She reports having had the kids for a week, which was 'nice, but exhausting.'").   Peraino had personally observed that at least one of Plaintiff's sons appeared to require near-constant supervision. (Tr. 852) ("Sandee presents today with her son[, who] presented with several needs, and Sandee spent a considerable amount of her session attending to them, so she had some difficulty focusing on her own session today.   She reports that they had a great week together[.]").

On December 12, 2019, Plaintiff, accompanied by her attorney, appeared for a hearing in this matter before an Administrative Law Judge ("ALJ"), who took testimony from Plaintiff and a vocational expert ("VE"). (Tr. 64–102).

Plaintiff claimed to be disabled due to mental illness, particularly anxiety, and migraine headaches, with both conditions flaring-up "multiple times a week." (Tr. 73).   Plaintiff essentially maintained that normal everyday circumstances, such as leaving her apartment and going outside, could cause her to feel anxious, with accompanying physical symptoms such rapid heartbeat, and that her anxiety then "triggered" migraine headaches. (Tr. 73–74).

Plaintiff indicated that she had previously worked full time despite her anxiety, at various jobs including cashier, offset press operator and factory worker, but maintained that her mental condition had gotten progressively worse over the ten years leading up to her alleged disability onset, and that she also began having migraine headaches. (Tr. 91–92).

Plaintiff denied that her problems are at all related to substance abuse, and, in response to the ALJ's questioning, specifically denied "ever" using marijuana, except to try it as a teenager. (Tr. 92).   Plaintiff also told various treatment providers that she only briefly tried marijuana and/or that the was allergic to marijuana. (Tr. 611, 613).   Although, Ransom's consultative psychiatric evaluation report diagnosed Plaintiff with "history of marijuana dependence, currently in early remission," and reported that Plaintiff claimed to have stopped using marijuana only as of September 2017. (Tr. 532, 534).

At the time of the hearing Plaintiff was financially supported by public assistance and living in public "supported housing," which she obtained through "mental health referrals." (Tr. 71).   Plaintiff indicated that the "support" she received through the supported housing arrangement consisted of having a "supportive housing specialist" check on her once per day[11] to help her achieve daily living goals relating to things such as time management. (Tr. 72).   Plaintiff stated that she had opted to move to a housing facility that, while still "supportive housing," had fewer mental health supports than her prior housing, both because she claimed not to need as much support and observation, and because she wanted a larger apartment for when her sons visited her.[12]

Following the hearing, the ALJ sent Plaintiff's "longitudinal mental health record" (Tr. 19) to psychologist Ann Monis, Psy.D. ("Monis") along with interrogatories assessing Plaintiff's mental impairments and Plaintiff's ability to perform work-related activities. (Tr. 1006-1029).   Monis found that Plaintiff's mental conditions were not severe enough to meet listings 12.04, 12.06, or 12.08 (Tr. 1028–1029).   With regard to the "B criteria" for those listings Monis indicated that Plaintiff had no more than "moderate" limitations in understanding, remembering or applying information, interacting with others, and concentrating, persisting or maintaining pace, and no more than "mild" limitations in adapting or

---

[11] Plaintiff's contention that she required daily support is inconsistent with the report of housing counselor Lyons, mentioned earlier, who indicated that Plaintiff required only monthly support. (Tr. 598–599).

[12] (Tr. 84) ("I wouldn't [be able to live by myself outside of supportive living,] I've never been able to handle living on my own.").

managing herself. (Tr. 1011).   Monis stated that Plaintiff had "mild" restrictions in understanding and remembering simple instructions, carrying out simple instructions, and making simple work-related decisions, and "moderate" restrictions in understanding and remembering complex instructions, carrying out complex instructions, and making complex work-related decisions. (Tr. 1006). Monis also found that Plaintiff had "moderate" restrictions in interacting appropriately with the public, supervisors, and co-workers, and "mild" restriction in responding appropriately to work situations and changes in work routine. (Tr. 1007).   Finally, in a paragraph entitled "Limitations Analysis/Narrative," Monis wrote:

> Based on the review of records it is reasonably expected that claimant can participate in work related activities that require: Ability to understand simple instructions.   Ability to engage in simple repetitive tasks independently.   Ab[ility] to maintain concentration for simple tasks.   Ability to adapt and respond well to infrequent changes in work setting.   Ability to make simple work-related decisions independently.   Ability to work with others – Moderate limitations in working with others; brief superficial contact with public and occasional w/ supervisors and coworkers.   Ability to complete a 6 to 8 hour workday and a 5 day workweek without psychologically based interruptions due to symptoms.

(Tr. 1029).

On July 7, 2020, the ALJ issued a Decision finding that Plaintiff was not disabled at any time between the alleged disability onset date and the date of the decision. (Tr. 10–26).   Applying the five-step sequential evaluation, the ALJ found, in pertinent part, that Plaintiff had severe impairments consisting of depressive

disorder, anxiety disorder, and borderline personality disorder, as well as non-severe impairments including migraine headaches and obesity; that Plaintiff's impairments, either singly or in combination, did not meet or medically equal a listed impairment; that Plaintiff had the RFC to perform work at all exertional levels, provided that it involved "simple, routine tasks," "a stable and predictable work environment," and only "occasional interaction with others"; that Plaintiff could perform her past relevant work as a hand packager and plastic products assembler; and, alternatively, that Plaintiff could also perform other jobs that exist in significant numbers in the national economy. (Tr. 13–26).

As relevant to this action, when evaluating the medical opinion evidence, the ALJ found Monis' opinion most persuasive.    In that regard, the ALJ found that the opinions of consultative examiner Ransom and agency review psychologist Dr. D'Ortona ("D'Ortona"), both of which essentially indicated that Plaintiff was capable of at least unskilled work, were "partially persuasive."    The ALJ found, however, that Monis' opinion was even more persuasive, since Monis had the benefit of seeing the longitudinal treatment record, and since Monis' opinion was more consistent with the record overall insofar as it limited Plaintiff's ability to interact socially with others, to accommodate Plaintiff's "social isolative tendencies, mood lability, and tendency to become overwhelmed." (Tr. 20–21).    In other words, the ALJ found that the opinions of D'Ortona, Ransom, and Monis were all persuasive, but that Monis' opinion was most persuasive because it was based on the entire record and was the most restrictive of the three opinions with regard to Plaintiff's

24

ability to interact socially.

On the other hand, the ALJ found that the opinions of Coffey and Peraino were only "minimally persuasive." (Tr. 21–23).   In that regard, the ALJ explained, for example, that Coffey's opinion concerning Plaintiff's limitations in maintaining hygiene and using public transportation were inconsistent with the record.   As for Peraino's opinions, the ALJ found them inconsistent with the record in various respects, particularly as to Plaintiff's ability to follow simple directions, maintain attention and concentration, remain on task, and attend work on a regular basis. (Tr. 21–23).   As additional reasons for finding Peraino's opinions only minimally persuasive, the ALJ indicated that Peraino's opinions were inconsistent with her own "relatively benign mental status examination findings;" "were not supported by detailed explanations of the relevant evidence relied upon"; and "were based primarily on the claimant's subjective reporting." (Tr. 21–23).

The ALJ also found that Plaintiff's subjective statements about her symptoms were not entirely credible inasmuch as they were inconsistent with the record overall, such as evidence of Plaintiff's ability to live independently, statements by Plaintiff denying depression and indicating that she typically had only low-level anxiety that did not interfere with her functioning, evidence of Plaintiff's daily activities, and evidence that Plaintiff's symptoms improved with treatment and with resolution of situational stressors.[13]

---

[13] *See*, (Tr. 19) (Citing Plaintiff's "improved mental health symptoms with treatment and situational stressor resolutions, the relatively benign mental status examination findings of record, her lack of recent inpatient hospitalizations and ability to live independently, look for work, maintain her

Plaintiff appealed to the Appeals Council and submitted a statement from Peraino purporting to explain discrepancies in Peraino's treatment notes. (Tr. 40). Essentially, Peraino stated that to the extent her descriptions of Plaintiff's symptoms were inconsistent from visit to visit, it was because Plaintiff's symptoms in fact were inconsistent. (Tr. 40) ("Sandee's mental health symptoms are not consistent.   She works hard to present well, and at times is able to do that for a short period of time, but is not able to maintain this level of functioning on a consistent basis.   This contributes to her pattern of being able to obtain jobs on occasion, but not maintain one for long.").   Peraino further suggested that her notes might have showed worse symptoms if Plaintiff had attended all of her sessions, but that Plaintiff sometimes skipped sessions when she claimed to be having her worst symptoms.

The Appeals Council denied Plaintiff's application, stating in pertinent part: "You submitted a Statement from Rachel Peraino, LMHC, dated August 12, 2020 (3 pages).   We find this evidence does not show a reasonable probability that it would change the outcome of the decision.   We did not exhibit the evidence." (Tr. 2).   Because of the denial, the ALJ's decision became the Commissioner's final decision.

In this action, as discussed further below, Plaintiff maintains that the Commissioner's decision was erroneous in several respects.

---

appointments, arrange for transportation, and maintain a visitation schedule with her children" as being inconsistent with total disability.).

First, Plaintiff maintains that the ALJ failed to evaluate the medical opinion evidence as required by 20 C.F.R. § 404.1520c, which, as discussed further below, requires the ALJ to evaluate the persuasiveness of medical opinion and to specifically discuss the factors of supportability and consistency.   Plaintiff asserts that the ALJ's analysis is flawed since he impermissibly "cherry picked" evidence (mental status examination results) that downplayed the severity of Plaintiff's depression, anxiety, and mood lability, while failing to discuss other evidence that was more favorable to Plaintiff.   Additionally, Plaintiff contends that the ALJ's analysis was erroneous insofar as it found that Monis' medical opinion was more persuasive than the other medical opinion evidence, and particularly Peraino's opinions, since Monis' opinion was neither well supported nor consistent with the other evidence of record.   Indeed, Plaintiff argues that Monis' opinion is so unsupported and inconsistent that it does not amount to substantial evidence. *See*, ECF No. 18-2 at p. 30 ("Neither Monis' opinions nor the ALJ's conclusions regarding them are supported by substantial evidence."). Plaintiff maintains, rather, that Peraino's opinions were well supported and consistent with the other evidence, and therefore should have been found more persuasive than Monis' opinion.[14]   Further, Plaintiff asserts that the ALJ's analysis of the medical opinion evidence was erroneous since it did not discuss how consistent the opinions were with nonmedical evidence consisting of statements from Plaintiff's mother and

---

[14]  ECF No. 18-2 at p. 32.

boyfriend.[15]   Additionally, Plaintiff contends that the ALJ and Monis may not have been aware that Plaintiff lived in supported housing or that Plaintiff's last job was supported through ARC, since neither discussed how those factors affected their decision and opinion, respectively.[16] Also, Plaintiff argues that the ALJ may have failed to consider the length and nature of the relationship that each treating source had with Plaintiff when evaluating the medical opinions.[17] Plaintiff also maintains that the ALJ failed to consider all the evidence when making her RFC determination since, for example, the ALJ did not discuss Plaintiff's unsuccessful work attempt through ARC involving a job coach and accommodations.   Finally, Plaintiff asserts that after finding Monis' opinion persuasive generally, the ALJ erred by failing to adopt Monis' opinion that Plaintiff was capable of working only 6 to 8 hours per day.[18]

Plaintiff further alleges that the ALJ erred in her assessment of Plaintiff's subjective symptoms. In that regard, Plaintiff reiterates her earlier argument that the ALJ failed to consider all the evidence as required by the Commissioner's regulations.   On this point, Plaintiff contends that the ALJ failed to consider statements by Plaintiff's mother and boyfriend.   Additionally, Plaintiff asserts that the ALJ's findings concerning her credibility were not supported by substantial evidence.   In particular, Plaintiff contends that there is not substantial evidence to

---

[15] ECF No. 18-2 at p. 35.
[16] ECF No. 18-2 at p. 35.
[17] ECF No. 18-2 at pp. 35–36.
[18] ECF No. 18-2 at pp. 36–37.

support the ALJ's findings that Plaintiff's symptoms improved with the resolution of situational stressors, that Plaintiff's mental status examinations were generally benign, that Plaintiff had not been hospitalized recently, that Plaintiff was able to live independently, that Plaintiff was able to maintain her appointments and arrange for transportation, and that Plaintiff was able to maintain a visitation schedule with her children.[19]

Lastly, Plaintiff contends that the Appeals Counsel erred when it "failed to give any reason for rejecting the additional information provided by [Peraino] in support of her opinions."[20]

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence. More specifically, Defendant maintains that the ALJ properly evaluated the medical opinion evidence, and that her findings regarding the persuasiveness of those opinions are supported by substantial evidence.   Further, Defendant contends that the ALJ properly evaluated Plaintiff's symptoms in accordance with the regulations and gave good reasons for finding that Plaintiff's complaints were not entirely consistent with the evidence.

The Court has carefully reviewed and considered the administrative record and the parties' submissions.

---

[19] ECF No. 18-2 at pp. 38–39 ("Other than pointing out some normal findings in the MSEs, the ALJ has failed to consider the consistency of [Plaintiff's] symptoms with all of the medical and nonmedical evidence.").
[20] ECF No. 18-2 at pp. 6, 32.

DISCUSSION

<u>The ALJ's Evaluation of the Medical Opinion Evidence</u>

Plaintiff alleges that the ALJ's finding concerning the persuasiveness of the medical opinion evidence was the product of legal error, and unsupported by substantial evidence, insofar as it found, among other things, that Monis' opinion was more persuasive than Peraino's opinion.

The ALJ was required to evaluate the medical evidence in this action pursuant to the Commissioner's rules for claims filed after March 27, 2017, which another district court in this Circuit has summarized as follows:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id*. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most

important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853. An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id*. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id*. at §§ 404.1520c(b)(3), 416.920c(b)(3).

*Raymond M. v. Comm'r of Soc. Sec*., No. 5:19-CV-1313 (ATB), 2021 WL 706645, at *4–5 (N.D.N.Y. Feb. 22, 2021).

In applying these rules, the Commissioner is required to consider every medical opinion that is received:

> The Social Security Administration regulations require the Commissioner to evaluate every medical opinion received. Although failure to consider a medical opinion might be harmless error if it could not have changed the outcome at the agency level, an ALJ's failure to consider a medical opinion is not harmless where that opinion is significantly more favorable to the plaintiff than those that were considered, and is not otherwise covered by other record evidence.

*Hubbard v. Comm'r of Soc. Sec.*, No. 18-CV-03119 (RWL), 2019 WL 3940150, at

*10 (S.D.N.Y. Aug. 5, 2019) (citations and internal quotation marks omitted).

The Commissioner's regulations define a "medical opinion" in pertinent

part as follows:

> Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
> ***
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

20 C.F.R. § 404.1513(a)(2)(ii) (Westlaw 2021).

In the instant case, Plaintiff begins by asserting that the ALJ impermissibly

"cherry picked" favorable mental-status examination results when evaluating the

medical opinion evidence.   However, the Court disagrees.

Of course, when considering medical evidence and other evidence, an ALJ

is not permitted to "cherry pick" evidence that supports his RFC finding while

ignoring other evidence that does not. *See, Bohart v. Astrue*, No. 10-CV-6503,

2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).

> Cherry-picking can be defined as "inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018). Cherry-picking can "indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (quoting *Younes v. Colvin*, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). But an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Indeed, what a claimant may label as cherry-picking can often be described "more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

*Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).[21]   Certainly, however, remand may be appropriate where a plaintiff demonstrates that an ALJ engaged in cherry picking or otherwise mischaracterized evidence. *See, Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision when it ignores or

---

[21] *See also, Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (Observing that some impairments, such as depression, may have symptoms that wax and wane, and that, "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days .... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing Dr. Dron's opinion.").

mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

The Court, though, having reviewed the entire record, does not agree that the ALJ cherry picked evidence.   Rather, the Court finds that the ALJ's summary of Plaintiff's mental status examination results was essentially accurate.   That is, Plaintiff's mental status at office visits was typically normal.   Nor does the Court otherwise see instances of cherry picking in this ALJ's decision.

Plaintiff nevertheless insists that the ALJ ignored or overlooked evidence when evaluating the medical opinion evidence.   As proof of this, Plaintiff points out that the ALJ failed to mention certain evidence, such as evidence from nonmedical sources. However, the Court again disagrees, since it sees no indication that the ALJ ignored or overlooked evidence.   The ALJ expressly indicated that she considered the entire record, and the fact that she did not mention a particular piece of evidence does not prove otherwise. *See, Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) ("Camille contends that the ALJ 'failed to evaluate or weigh [Dr. Dawood's] opinion from October 12, 2011.'   While the ALJ's written decision did not specifically reference this document, 'an ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.' *Brault v. SSA, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (internal quotation marks and citation omitted).") (internal page citation omitted).   Additionally, the ALJ expressly noted that 20 C.F.R. § 404.1520c(d) did not require her to articulate

how she considered evidence from nonmedical sources. (Tr. 24).

Moreover, Plaintiff's suggestion that the ALJ may have been unaware of certain facts, such as the fact the Plaintiff lived in supported housing, is speculative and, in some cases, disproved by the record.  For example, the ALJ's decision expressly refers to Plaintiff's supported housing residence. (Tr. 18) (Referring to Plaintiff's Ontario Apartments Initial Plan Functional Assessment).

Plaintiff further contends that the ALJ erred in finding that the opinion of Monis, a non-examining medical expert, was more persuasive than the opinions of Coffey and Peraino.  Plaintiff asserts that Monis' opinion is not substantial evidence to support the RFC finding since, for example, Monis just "cut and pasted" certain portions of the record into her report, as support for certain of her findings.  However, the Court again disagrees.

The Court notes, preliminarily, that Monis' report was not the best-organized or easy-to-follow report it has seen.  However, despite its flaws in that regard, Monis' findings, and the reasons therefor, were evident from her report and supported by the record.  The ALJ was not required to reject the report based simply on the odd "cut-and-paste" format chosen by Monis.  Nor does the Court accept Plaintiff's speculative argument that Monis may not have had an adequate record upon which to base her opinion, since the ALJ expressly indicated that she provided Monis with Plaintiff's "longitudinal mental health record." (Tr. 19).[22]

---

[22]  The ALJ's decision also rejected Plaintiff's objection that Monis' opinion "was based on narrow selections from the medical record." (Tr. 10).

The Court also finds that Plaintiff has not otherwise shown that the ALJ failed to properly evaluate the medical opinion evidence.   The ALJ gave valid reasons for her evaluation of the medical opinions, and, in particular, for finding that Peraino's opinion was only "minimally persuasive."   The ALJ's findings are supported by substantial evidence which, as discussed earlier, is a very deferential standard.

Plaintiff alternatively contends, however, that since the ALJ found Monis' opinion to be persuasive, she was also required to accept Monis' statement that Plaintiff was capable of "complet[ing] a 6 to 8 hour workday and a 5 day workweek,"[23] which according to Plaintiff proves that she was not able to work full 8-hour days.   Again, the Court disagrees.

It is clear that when an ALJ finds a particular medical opinion to be persuasive, the ALJ is not required to adopt every limitation contained in the opinion when making an RFC determination.   Rather, the RFC finding need only be supported by the record as a whole. *See, e.g., Melanie L. v. Comm'r of Soc. Sec.*, No. 5:22-CV-87 (ATB), 2022 WL 17992220, at *9 (N.D.N.Y. Dec. 29, 2022) ("The ALJ was not required to accept every limitation in the various medical opinions or to craft an RFC mirroring a particular opinion. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is]

---

[23] Tr. 1001

consistent with the record as a whole.")"). Here, in addition to Monis' opinion, there was other evidence to support the RFC finding that Plaintiff is capable of full-time employment, such as the opinions of Dr. D'Ortona and Dr. Ransom.

<u>The ALJ's Evaluation of Plaintiff's Symptoms</u>

Plaintiff next contends that when evaluating her symptoms, the ALJ again erred by "fail[ing] to consider the entire record."[24] On this point, Plaintiff alleges that the ALJ's "most obvious failure" was in not discussing whether "the statements from the third-parties [were] consistent with [Plaintiff's] statements."[25] Plaintiff also alleges that the ALJ's findings regarding Plaintiff's symptoms and credibility are not supported by substantial evidence. However, the Court again disagrees.

As already discussed, Plaintiff's contention that the ALJ failed to consider evidence lacks merit. Additionally, the Court determines that the ALJ's findings regarding the severity of Plaintiff's symptoms are supported by substantial evidence.

<u>The Appeals Council's Decision</u>

Lastly, Plaintiff maintains that the Appeals Council's denial of her appeal was improper since it failed to give any reason for rejecting Peraino's letter. *See*, ECF No. 18-2 at p. 32 ("Here, the AC has also erred in failing to properly consider the additional explanation provided by Peraino in support of her opinions. Her letter, *rejected without explanation*, addresses the ALJ's conclusions that her

---

[24] ECF No. 18-2 at pp. 37–40.
[25] ECF No. 18-2 at p. 38.

opinions were not properly explained.") (emphasis added); *see also, id*. at p. 6 (contending that the Appeals Council failed to offer "*any reason for rejecting*" Peraino's explanation) (emphasis added).[26]   However, that argument is incorrect, since the Appeals Council stated that it rejected the submission for a reason, namely: "You submitted a Statement from Rachel Peraino, LMHC, dated August 12, 2020 (3 pages).   We find this evidence does not show a reasonable probability that it would change the outcome of the decision." (Tr. 2).   In that regard, the Appeals Council was referring to 20 C.F.R. § 404.970(a)(5), which states in pertinent part that, "the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, *and there is a reasonable probability that the additional evidence would change the outcome of the decision*." (emphasis added).   Consequently, the Appeals Council provided a valid reason for rejecting Peraino's letter.   Additionally, the Court finds that Plaintiff has not shown that Peraino's letter creates a reasonable probability of a different outcome.

The Court has considered all of Plaintiff's arguments and finds that they lack merit.

---

[26] In her reply brief, Plaintiff acknowledges that the Appeals Council actually gave a reason for not accepting Peraino's letter, but now contends that the Appeals Council's "terse statement" was an inadequate explanation. ECF No. 23 at pp. 6–7.   That is, Plaintiff has gone from claiming that there was no explanation given to claiming that an inadequate explanation was given.   However, the Court need not consider arguments raised for the first time in a reply brief.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 18) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 21) for the same relief is granted.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       March 24, 2023

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

39